UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| WILLIAM CARTER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 4:05CV1211 HEA |
| | ) |
| JAY ENGLEHART, | ) |
| | ) |
| Defendant. | ) |

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment, [Doc. No 24]. Plaintiff has not responded to the Motion. For the reasons set forth below the Motion is granted.

### Facts and Background

Plaintiff is civilly committed to the Missouri Sexual Offender Treatment Center (MSOTC). He brought this action under the provisions of 42 U.S.C. § 1983. In his Complaint, Plaintiff claims that He is suing Defeat in his "personal individual capacity" for Defendant's having had his security aides forcibly inject Plaintiff with Halodol on April 15, 2005. Plaintiff states that he is suing "defendant under medical malpractice, gross negligence, violation of civil rights."

The uncontroverted facts, as set forth by Defendant establish the following:

Plaintiff is a resident at the Missouri Sex Offender Treatment Center. He was referred to the MSOTC from Fulton State Hospital, where he was previously housed following a plea of not guilty by reason of mental disease or defect to charges of forcible sodomy, burglary, felonious restraint, and sexual assault.

When Plaintiff was referred to the MSOTC for evaluation as a possible sexually violent predator under RSMo. Section 632.482 *et seq.*, he was given sex offender treatment, as he had a standing, valid order for such treatment. Plaintiff refused this treatment at MSOTC.

On August 29, 2002, Defendant conducted a Medical and Psychiatric Assessment of Plaintiff. In his Medical and Psychiatric Assessment, Defendant submitted an Axis I diagnosis of Plaintiff that included the conditions of Paraphilia Not-Otherwise Specified (non-consenting), and Possible Sexual Sadism. These diagnoses were based on Defendant's interviews with Plaintiff, Plaintiff's Probable Cause Evaluation pursuant to CITE and Plaintiff's Fulton State Hospital Chart.

Plaintiff was eventually determined to be a sexually violent predator and is currently committed to MSOTC as such. After this commitment, Defendant revised his initial Medical and Psychiatric Assessment of Plaintiff. In his Addendum, Defendant revised his Axis I diagnosis of Plaintiff as follows: Delusional disorder, Mixed type, with Grandiose and Erotomanic Features." He further explained that since Plaintiff's initial detention at MSOTC, Plaintiff had repeated his previously

documented behavior with a delusional intensity.  Defendant noted that at MSOTC, as at Fulton, Plaintiff had become fixated on an employee, then threatened her when she rejected him.  Defendant also explained in the Addendum that the diagnosis of delusional disorder replaced the previous diagnoses because all of Plaintiff's behaviors could be explained under a single diagnosis.  Defendant also noted that Plaintiff continuously interpreted facts in a way which supported his pre-defined beliefs.

If was noted in the June 2, 2004 Quarterly Treatment Plan Review that Plaintiff was noted to have consistently refused to consent to treatment.  It was also noted that Plaintiff continued to express grandiose ideas about himself and had shown the traits of someone who stalks women and/or held erotomanic delusions about them.  In the past, Plaintiff had expressed extreme anger and/or attempts to harm those women who had rejected him.

Plaintiff refused to attend Responsibility Therapy Groups on April 11, 2005, September 2, 2005 and September 8, 2005.

In the ("September Treatment Review"), Plaintiff was also noted to refuse evaluation by a psychiatrist, stating that he needs to talk to his lawyer.

In a January 5, 2005 Treatment Review ("January Treatment Review") Plaintiff was noted to have incurred 13 rule violations since the September

Treatment Review, including threats, verbal abuse, and creating a disturbance. In the January Treatment Review, Plaintiff was noted to have still refused to meet with his assigned case manager. Plaintiff's mood was noted to be "predominately angry." It was also noted that Plaintiff frequently had verbal altercations/confrontations with staff and peers. It was also noted that Plaintiff had pushed his chest into another resident's chest. The January Treatment Review noted that Plaintiff had refused to see Defendant despite his increased agitation and paranoia along with episodes of talking to himself and answering his own questions. It was further noted that Plaintiff continued to file lawsuits and made few lucid or reality based claims.

On October 1, 2004, Plaintiff threatened another resident. Due to his threatening behavior and comments, Plaintiff was placed in protective isolation from October 1, 2004 to October 5, 2004.

On February 12, 2005, Plaintiff was heard to say to two other residents, "They're going to push me so far, I'm going to punch so hard." On that same date, Plaintiff was also heard to say "I'm not going to be like V.M. and just stab them in the neck with a pen." After making this comment, Plaintiff made a gesture as if stabbing himself in the neck.

On February 15, 2005, when Plaintiff was informed by an aide that Plaintiff had not earned his night time respect tokens, Plaintiff called the aide a "punk

bitch." Plaintiff then received a violation for disrespect, and he responded by saying he was just venting, and added that the aide was slamming a door on purpose and again called the aide a "punk bitch." Plaintiff was heard by a staff member to make the following threat: "These people push me so far that I am going to start pushing back and not with a pencil."

On February 20, 2005, Defendant was asked by staff to evaluate Plaintiff for involuntary medication given his recent threats. Defendant had previously been asked by staff to evaluate Plaintiff for involuntary medication.

Defendant completed a letter to Plaintiff about Defendant's decision to seek an involuntary medication order. Defendant's letter advised Plaintiff of his diagnoses of Delusional Disorder with both Erotomanic and Grandiose features. Defendant's letter advised Plaintiff of the specific psychotropic medication, Risperdal, which Defendant prescribed for Plaintiff. The letter advised Plaintiff of the facts surrounding the need for Risperdal, including Plaintiff's consistent refusal to participate in treatment based on delusional beliefs. The letter also noted the need for Risperdal treatment, because Plaintiff had been harassing a security aide in recent months. The letter also noted the need for Risperdal treatment, because Plaintiff in recent months had attempted to inappropriately touch the ward housekeeper on at least one occasion. It also noted the need for Risperdal treatment, because Plaintiff had voiced threats on February 12, 2005 and February

15, 2005, which prompted the staff to put Plaintiff under intensive monitoring. The letter also noted the need for Risperdal treatment, in that Plaintiff had exhibited increasing difficulties both understanding relatively simple concepts and difficulty communicating in a logical, coherent manner. Defendant's letter explained that antipsychotic medication is the standard treatment for delusional disorder. The letter explained that possible side effects of Risperdal include stiff muscles or tremors, sedation, constipation, urinary retention, and rarely, liver dysfunction and abnormal involuntary movements. Further, the letter noted that these side effects are relatively uncommon, and are either transient or can be managed through medical intervention. The letter advised of his treatment plan: 1 mg of oral Risperdal at bedtime, with an increase to 2mg after two to four weeks. Defendant's letter also advised that if Plaintiff refused to voluntarily take oral Risperdal, he would receive a 5 mg injection of Halodol by an involuntary medication order if approved. The letter cautioned that Halodol has similar side effects to Risperdal, but they are in general more likely to occur with Halodol. The letter also stated that in Defendant's opinion, antipsychotic medication is the least restrictive treatment to accomplish the overall treatment goals of the program. Defendant also gave notice of the upcoming evaluation by Dr. Angeline Stanislaus for a second opinion. Defendant concluded his letter by emphasizing his professional judgment that Plaintiff's illness caused the lack of

insight that prevented him from participating in the program and consistent refusal of psychiatric intervention.

On February 20, 2005, Plaintiff was offered oral Risperdal as prescribed by Defendant. Plaintiff was given the right to refuse the Risperdal at that time. Plaintiff exercised his right to refuse the oral Risperdal on February 20, 2005. Plaintiff was offered, and exercised his right to refuse, oral Risperdal each night from February 20, 2005 through March 4, 2005.

On March 4, 2005, at 2:00 p.m., Plaintiff was visited by Dr. Angeline Stanislaus for a second opinion as to the necessity of antipsychotic medication. Dr. Stanislaus explained to Plaintiff the purpose of her visit and requested to speak with him about the matter. Plaintiff refused to meet with Dr. Stanislaus without having an attorney present and having the meeting videotaped. As a result of Plaintiff's refusal to meet with her, Dr. Stanislaus based her opinion on a review of the clinical record. After reviewing the clinical record, and based on Plaintiff's observed behavior, Dr. Stanislaus concurred with Defendant's Axis I diagnosis that Plaintiff suffers from "Delusional Disorder, erotomania/grandiose." In particular, Dr. Stanislaus noted that Plaintiff's "romantic/sexual fixation on females and belief that they are in love with him and subsequent feelings of rejection and anger resulting in wanting to take revenge fits into this

diagnosis." Dr. Stanislaus further noted that "he has constant belief of being 'unfairly treated' – persecution is evident in the recurrent grievances that he continues to submit," and that "[h]e has also engaged in recurrent aggressive behaviors due to his beliefs." Dr. Stanislaus opined that "at the present time, psychotropic medication treatment is warranted." Additionally, Dr. Stanislaus observed that "Mr. Carter lacks insight and refusing medication. Therefore, enforcing psychotropic medication is justified." Dr. Stanislaus also concurred that Risperdal is appropriate for treatment of delusional disorder. Dr. Stanislaus noted that "[d]ue to lack of treatment of delusional disorder, his aggressive behaviors has continued to escalate." Dr. Stanislaus also noted that "[w]ith his history of serious violent behaviors, his threats towards staff should be taken seriously and prevented. Because of constant preoccupation with these beliefs and thoughts, Mr. Carter has not engaged in any meaningful treatment and continues to disrupt the milieu." Dr. Stanislaus also opined that "Risperidone 1 mg [twice a day], initially, titrated up to therapeutic response – up to 16 mg per day, is appropriate." According to Dr. Stanislaus, "Risperidone is not available as short acting intramuscular form, for medication refusal." Dr. Stanislaus observed that "side-effects of Risperidone include sedation, dry mouth, restlessness, and possibly increased prolactin and extra pyramidal side effects in high dosages." Dr. Stanislaus recommended that "in the inpatient setting, [Carter] can be monitored closely for

these side-effects and manage by dose reduction, change to another medication, or addition of medications to counteract these side effects." Dr. Stanislaus further opined that "[i]nvoluntary medication is the least restrictive treatment under the present circumstances. Also, psychotropic medications are the main line of treatment for this illness." In the opinion of Dr. Stanislaus, "Mr. Carter lacks insight into his illness. He does not believe anything is wrong with him." Dr. Stanislaus concluded her evaluation with this opinion: "Based on the above evaluation, I recommend involuntary administration of psychotropic medications."

On March 5, 2005, the day after refusing to meet with Dr. Stanislaus for an independent evaluation, Plaintiff declined his right to refuse, and voluntarily accepted, the oral Risperdal as prescribed by Defendant. From March 5, 2005 through April 22, 2005, Plaintiff declined his right to refuse, and voluntarily took the oral 1 mg. Risperdal as prescribed by Defendant.

On March 7, 2005, Defendant wrote a letter to Plaintiff advising him that Dr. Stanislaus concurred in the decision to treat Plaintiff with oral Risperdal or, if necessary, with Halodol if the Risperdal is refused. The March 7, 2005 letter from Defendant also referenced that Plaintiff had been provided a copy of Department of Mental Health procedures for involuntary medication.

On March 11, 2005, Plaintiff appealed the treatment decision of Defendant

and concurring opinion of Dr. Stanislaus on the ground that involuntary medication was against his Catholic religious beliefs. Under authority of Section 630.050 Revised Statutes of Missouri, the Missouri Department of Mental Health ("DMH") promulgated procedures, known as Department Operating Regulation ("DOR") 4.152, for involuntarily committed patients to appeal involuntary medication orders. MSOTC has also promulgated its internal procedures for patients committed as sexually violent predators, which follow DOR 4.152. As provided by DOR 4.152, and MSOTC procedures, an involuntarily committed patient who appeals an order for involuntary medication on ground of religious beliefs has the right to be present at a hearing before an independent panel consisting of a facility chaplain, a licensed social worker, a psychologist, and the medical doctor. The panel is directed to determine that "(1) the patient's religion is a generally recognized, organized faith which teaches reliance on spiritual means, and; (2) the patient has been and is currently an active participating member."

By letter dated March 14, 2006, Plaintiff was given notice of the hearing on his appeal to be held on March 21, 2005, the members of the panel, and the issues before it.

On March 22, 2005, a panel was convened to hear Plaintiff's appeal on religious grounds from the treatment decision of Defendant and the concurring

opinion of Dr. Stanislaus.  In addition to Defendant, the panel consisted of Alan Blake, the Chief Operating Officer of MSOTC, Dr. Jon Rosenboom, Psy.D., Mary Weiler, M.S.W., L.C.S.W., and Chaplain Sean Maney.  Plaintiff was present at the hearing.  Defendant's opinion regarding involuntary medication was also reviewed by a third physician, Dr. Joseph Parks, who concurred in Defendant's judgment that involuntary medication was indicated.

On March 25, 2005, Alan Blake advised Plaintiff that his appeal on religious grounds were denied, as the Catholic religion did not oppose the use of psychotropic medications and Plaintiff had not been confirmed in the Catholic faith.

On April 4, 2005, Defendant wrote Plaintiff to advise him that, given the disposition of Plaintiff's appeal, he would be prescribing Risperdal and, in the event of refusal, involuntary administration of Halodol.  After this order, Carter continued to voluntarily take oral Risperdal until April 23, 2005.

An annual examination of mental condition conducted by Linda Meade, Ph.D., noted that on April 21, 2005, Plaintiff had refused several attempts to have his blood drawn per Defendant's orders.  Reportedly, Plaintiff had attempted to negotiate his cooperation, stating he would allow staff to draw blood if he could have a copy of the lab results without submitting a team request, or having the blood drawn before breakfast.  As a result of these actions and other negative behaviors, Carter's

Risperdal was increased from 1mg to 2mg on April 23, 2005. Upon hearing about the increase, Plaintiff refused Risperdal and was administered Halodol involuntarily.

On April 30, 2005, after nearly two months of voluntary oral Risperdal medication, Plaintiff met with Defendant. Plaintiff's agreement to meet with Defendant was a "behavioral change." Plaintiff admitted to Defendant at this meeting that "he now feels that I [Defendant] did something good for him when he was on 1 mg of Risperdal."

## **Summary Judgment Standard**

The standards for summary judgment are well settled. In determining whether summary judgment should issue, the Court must view the facts and inferences from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Employers Mut. Cas. Co. v. Wendland & Utz,* Ltd, 351 F.3d 890 (8th Cir. 2003); *Enter. Bank v. Magna Bank* 92 F.3d 743, 747 (8th Cir. 1996). The moving party has the burden to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Enter. Bank*, 92 F.3d at 747. Once the moving party has met this burden, the nonmoving party may not rest on the allegations in his pleadings but by affidavit or

other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed.R.Civ.P. 56(e); *Anderson* 477 U.S. at 256; *Krenik v. Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). To survive a motion for summary judgment, the "nonmoving party must 'substantiate his allegations with sufficient probative evidence [that] would permit a finding in [his] favor based on more than mere speculation, conjecture, or fantasy.' *Wilson v. Int'l Bus. Machs. Corp.*, 62 F.3d 237, 241 (8th Cir. 1995)(quotation omitted)." *Putman v. Unity Health System*, 348 F.3d 732, 733-34 (8th Cir. 2003). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

> Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Aviation Charter,* [*Inc. v. Aviation Research Group/US*], 416 F.3d [864] at 868 [(8th Cir.2005)]. We view the evidence and the inferences that may reasonably be drawn therefrom in the light most favorable to the nonmoving party. *Id.* A party opposing summary judgment is not permitted to merely rest on his pleadings but must instead set forth sufficient evidence from which a reasonable jury could find in his favor on all elements of his claims. *See Thompson v. Hubbard,* 257 F.3d 896, 898-99 (8th Cir.2001); *Bailey v. United States Postal Service,* 208 F.3d 652, 654 (8th Cir.2000).

*Johnson v. Hamilton,* 452 F.3d 967, 971-72 (8th Cir. 2006).

## Discussion

Plaintiff claims that the single administration of Halodol violated his civil rights and constituted medical malpractice and gross negligence. While a significant

liberty interest in avoiding the unwanted administration of Antipsychotic medication exists, *Morgan v. Rabun*, 128 F.3d 694, 696 (8th Cir. 1997), the liberty interest is not absolute. *Kansas v. Hendricks*, 521 U.S.346, 357 (1997). There must be a balance between institutional needs and the provisions of the Constitution that are of general application. *Washington v. Harper*, 494 U.S. 210, 236 (1990). Plaintiff's liberty interest, therefore is balanced with the state interest for administering medication and maintaining the safety and well being of both Plaintiff and the other residents of MSOTC. *Morgan*, 128 F.3d at 697.

The uncontroverted facts establish that the medication was in Plaintiff's best interests. The letter from Defendant to Plaintiff thoroughly explains why the medication is the least restrictive treatment available to accomplish the overall treatment goals of the program. It is standard treatment for the delusional disorder of which Plaintiff has been diagnosed. Defendant's conclusions were reviewed by two separate physicians. Both concurred with Defendant's diagnosis and conclusions. The request for the forced medication was made only after Plaintiff had refused the oral medication and was administered on a single occasion. Plaintiff himself acknowledged that the medication improved his disposition. The record is replete with documentation of the process through which the decision was made to administer the medication. Balancing Plaintiff's liberty interest with those of the state, the record establishes that the single administration of Halodol did not

unnecessarily impinge Plaintiff's liberty interest in avoiding the unwanted administration of antipsychotic medication.

With respect to any procedural due process claim Plaintiff may argue regarding the administration of medication violating his Catholic beliefs, the record sets forth that the MSOTC followed its strict procedural mechanism through which Plaintiff could challenge the administration. The facts surrounding the need for medication were articulated to Plaintiff in a letter from Defendant. Included in the letter were the diagnosis, specific name of the medication, the proposed regimen, possible side effects, and factors which may have led to Plaintiff's refusal.

Plaintiff was given a hearing before a panel regarding his religious objections. It was concluded that his objection based on his religious beliefs did not outweigh the need for the medication because there was no evidence that it violates the Catholic religion to administer the medication, nor was there any evidence that Plaintiff has been confirmed in the Catholic church. The record unequivocally establishes that Plaintiff was clearly given the process which was constitutionally due with respect to his objections based on religious beliefs.

Plaintiff has presented nothing regarding his claims of medical malpractice and gross negligence. Such claims are not actionable under Section 1983. It is well-settled that claims of negligence are not actionable under §1983. *Hart v. City of Little Rock*, 432 F.3d 801, 805-806 (8th Cir. 2005); "Mere negligence or medical

unnecessarily impinge Plaintiff's liberty interest in avoiding the unwanted administration of antipsychotic medication.

With respect to any procedural due process claim Plaintiff may argue regarding the administration of medication violating his Catholic beliefs, the record sets forth that the MSOTC followed its strict procedural mechanism through which Plaintiff could challenge the administration. The facts surrounding the need for medication were articulated to Plaintiff in a letter from Defendant. Included in the letter were the diagnosis, specific name of the medication, the proposed regimen, possible side effects, and factors which may have led to Plaintiff's refusal.

Plaintiff was given a hearing before a panel regarding his religious objections. It was concluded that his objection based on his religious beliefs did not outweigh the need for the medication because there was no evidence that it violates the Catholic religion to administer the medication, nor was there any evidence that Plaintiff has been confirmed in the Catholic church. The record unequivocally establishes that Plaintiff was clearly given the process which was constitutionally due with respect to his objections based on religious beliefs.

Plaintiff has presented nothing regarding his claims of medical malpractice and gross negligence. Such claims are not actionable under Section 1983. It is well-settled that claims of negligence are not actionable under §1983. *Hart v. City of Little Rock*, 432 F.3d 801, 805-806 (8th Cir. 2005); "Mere negligence or medical

malpractice, however, are insufficient to rise to a constitutional violation. *Id.* at 106, 97 S.Ct. at 292." *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997). Because Defendant is entitled to summary judgment on Plaintiff's 1983 claim, the Court will not retain jurisdiction over Plaintiff's state law claims of medical malpractice and gross negligence.

## Conclusion

Defendant is entitled to judgment as a matter of law pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff has failed to controvert the evidence presented by Defendant that the actions taken regarding the involuntary administration of Halodol on one occasion was justified. As such, Plaintiff's claims against Defendant fail.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment, [Doc. No. 24], is granted.

A separate judgment in accordance with this Memorandum and Order is entered this same date.

Dated this 5th day of February, 2007.

_____
  HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE